UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| PLAINTIFF, | ) CASE NO. 2:21-cr-89 |
| | ) |
| vs. | ) |
| | ) |
| JAMES VERL BARLOW, | ) |
| | ) |
| DEFENDANT. | ) |
| _____ | ) |

*PORTIONS UNDER SEAL*
TRANSCRIPT OF *SENTENCING AND FORFEITURE* PROCEEDINGS
BEFORE THE HONORABLE SARAH D. MORRISON
WEDNESDAY, DECEMBER 7, 2022; 9:05 A.M.
COLUMBUS, OHIO

FOR THE PLAINTIFF:
Kenneth L. Parker
United States Attorney
By:  MICHAEL J. HUNTER
ASSISTANT UNITED STATES ATTORNEY
303 Marconi Boulevard, 2nd Floor
Columbus, Ohio 43215

FOR THE DEFENDANT JAMES BARLOW:
Brown Mishler PLLC
By:  CHRISTOPHER S. MISHLER, ESQ.
WILLIAM H. BROWN, ESQ.
911 North Buffalo Drive, Suite 202
Las Vegas, Nevada 89128

Brunner Quinn
By:  STEVEN M. BROWN, ESQ.
5664 Montridge Lane
Dublin, Ohio 43016

Also present:  Michelle Gable, USA Forfeiture Paralegal

- - -

Proceedings recorded by mechanical stenography,
transcript produced by computer.

Allison A. Kimmel, FAPR, RDR, CRR, CRC
Federal Official Court Reporter
85 Marconi Boulevard
Columbus, Ohio 43215
614.719.3225

2

Wednesday Morning Session

December 7, 2022

- - -

(The following proceeding was held in open court.
Defendant present.)

DEPUTY CLERK:  Your Honor, the case before you today
is the United States of America versus James Verl Barlow,
Case No. 2:21-cr-89-1.

THE COURT:  If counsel will please enter their
appearances, starting with counsel for the government.

MR. HUNTER:  Good morning, Your Honor.  Michael Hunter
on behalf of the United States.

I'm joined at the counsel table by Michelle Gable.
She's a paralegal in our forfeiture section.

THE COURT:  We've talked to her on the telephone.

MR. MISHLER:  Christopher Mishler appearing on behalf
of James Barlow, present out of custody, and accompanied by
local counsel, Steve Brown, and Mr. William Brown.

THE COURT:  Good morning.  Nice to meet all of you in
person as well.

So we have got a couple of things going on today, and I
did switch the order around in part because I just thought it
made more sense to do kind of the two sentencings together.

We've got, I know, several people you've indicated,
Mr. Mishler, speaking both on behalf of James Barlow and on

3

1    behalf of Matt Barlow, and so let's do the forfeiture

2    discussion first.

3         And I have -- when we talked on the phone, I know there

4    was a follow-up email with me asking about the potential rights

5    or how third parties can assert their rights in the property

6    subject to forfeiture.  I know your reply did address it.  So I

7    now have read that.

8         I think I was kind of looking at the burden of proof,

9    and it seems to me that it is Mr. Barlow's burden at this point

10   to show that the property isn't subject to forfeiture in light

11   of the plea agreement that we've entered.

12        And so that means that, Mr. Mishler, I'm going to let

13   you go first since you have the burden here.

14        MR. MISHLER:  On just -- are we talking just about the

15   third-party rights?

16        THE COURT:  Just, well, about the entire forfeiture

17   issue also.  And in my mind, that's both third-party rights and

18   the property that you claim is not subject to forfeiture.

19        MR. MISHLER:  Yes, Your Honor.

20        After reviewing it, I think the government is correct.

21   I preferred not to assert rights on the index fund.

22        I think the third-party's rights would be cleaner if we

23   don't assert rights.  I think that just muddies the water for

24   them later so --

25        THE COURT:  Great.  Then that also streamlines things

1    for this morning.

2        So then I think that leaves only the issues related to

3    the property that Mr. Barlow asserts he had pre-drug

4    trafficking organization, and that's what -- the only thing

5    left from Mr. Barlow's perspective to be carved out; is that

6    right?

7            MR. MISHLER:  That's correct, Your Honor.

8            THE COURT:  Okay.  All right.  You still get the

9    floor.

10           MR. MISHLER:  So I would have Mr. Barlow testify

11   regarding the forfeiture issue.  Do you want him in the chair

12   or --

13           THE COURT:  I would.  Let's do that.

14       If you will stand before you sit down, Mr. Barlow,

15   Ms. Rossi will swear you in.

16       (Witness sworn.)

17           DEPUTY CLERK:  Thank you.

18           THE COURT:  Thank you.  You may seated.  I don't know

19   if you are going to use the screen.

20       If not, you can push the screen out of your way, just

21   one more thing on a not big area.

22           Mr. Mishler, if you will question from the podium,

23   please.

24       You may proceed.

25           MR. MISHLER:  Thank you, Your Honor.

1                            - - -

2                        JAMES BARLOW

3      Called as a witness on behalf of the Defendant, being first

4      duly sworn, testified as follows:

5                        DIRECT EXAMINATION

6      BY MR. MISHLER:

7      Q.   Mr. Barlow, tell me when you first started investing in

8      cryptocurrency.

9      A.   It would have been in December of 2012.

10     Q.   And tell me how that went.

11     A.   I was in San Francisco visiting my friend's cousin, and

12     the subject came up.  I had never heard of it before, and I was

13     being fascinated.

14          And within -- I think it's like a day or two, it was

15     like, well, let's find something, and so I went.

16          There was a website where you can meet up with people,

17     and I just met some person on the street and just traded a

18     couple hundred dollars for some bitcoin.

19          And from there, I was just hooked.

20          I just thought it was one of the coolest things ever,

21     just -- 'cause like around that time, it was -- it was

22     something so new and different, and there's a lot of -- they

23     call themselves like Crypto Utopians or people thinking, hey,

24     this is going to be the end of Fascism in the world because,

25     you know, dictators can't just attack -- steal money from

1   people.  They have to take it, or they can't use inflation to

2   take money.

3        Anyway, there's a whole thing, and I got into it back

4   then.

5   Q.   Okay.  I know the drug trafficking organization began

6   late 2014.

7        Up to that point, how much cryptocurrency had you

8   accumulated?

9   A.   I don't know the exact figure, but around 900 bitcoin is

10  fair to say.

11  Q.   Did you only have bitcoin?

12  A.   No.  I had tried some other different cryptocurrencies.

13  I have some that don't exist really anymore.  There's like

14  Namecoin and then Litecoin, which still exists, and there's a

15  bunch of other things I tried, just different blockchains.

16       I was reading a lot of white papers and trying to

17  explore the technology of sort of the different kind, but most

18  of it -- well, it started as bitcoin and it remained as bitcoin

19  for the most part.

20  Q.   But you sold some of it at some point?

21  A.   Yeah.  Just -- just taking profits.

22       I mean, I had so much.  And then my initial purchase was

23  maybe about $10,000 worth, which is money I had left over from

24  serving in Iraq or, way more precise, my Iraq money, I bought a

25  Corvette, and then I sold the Corvette, and I turned that money

7

1    into bitcoin.

2          And then just, yeah, when it doubled, I sold some.  And

3    then when it doubled and doubled again, I sold a little bit

4    more.

5          And just like everyone in the space, then I just patted

6    myself on the back thinking I'm some sort of financial genius

7    when I just happened to be in the right place at the right

8    time.

9    Q.    Is there some of that bitcoin that still exists?

10   A.    Yes.

11   Q.    How much?

12   A.    By my estimates, it's somewhere in the neighborhood of

13   like 150.  That's why --

14   Q.    Why do you say "in the neighborhood"?

15   A.    Just because I don't have the exact figures because a

16   lot of that information is on wallets that I used in the past.

17         But then since I emptied and took the bitcoin out of it,

18   I just left it on old laptops, which were taken during the raid

19   at my house.

20         So that while there's no money on those wallets, the

21   information of where it went from transaction to transaction is

22   detailed.

23         But I know that the stuff that I had, I would have

24   moved, and it was what I sent to Binance within -- it was used

25   as collateral to take out loans to get those four items that

1    I'm requesting back.

2    Q.   Let me ask you about wallets.  Can you explain how a

3    wallet works?

4    A.   There's -- there are a couple of different kinds of

5    wallets.  There's a wallet that has multiple private keys.

6         There's also what's called heuristic-deterministic

7    wallets, which means there's one private key and it makes

8    multiple addresses.

9         But as far as the public looks, one address is

10   indistinguishable from another.  You can't tell the two

11   addresses are in the same wallet unless you know or have seen

12   them together yourself.

13        So a wallet will have multiple addresses, and each

14   address can have a different amount in it, and it can move

15   between addresses within the wallet or from those addresses to

16   outside.

17        And it's possible to have money in one address from one

18   source and one address in -- another address from another

19   source, and then you choose at a time of spending which one you

20   are spending from.

21   Q.   Does a wallet have an address?

22   A.   It can have an identifier.  It will have like a -- if

23   it's an HD wallet, the heuristic-deterministic wallet, it will

24   have a public key that can be used to verify that all addresses

25   belong to the same umbrella, but that is something that can be

1    chosen to be shared or not.

2         So there are -- so -- so I guess the answer would be,

3    no, that each wallet doesn't have one unique address.  It can

4    have many.  But there are -- but wallets can be identified by,

5    say, the first address.

6    Q.    Okay.

7    A.    There's only one wallet that would have that particular

8    address as its first one.

9    Q.    So if you bought bitcoin and put it in a wallet and then

10   a week later bought more bitcoin and put it in the same wallet,

11   what would that look like?

12   A.    You could either put that in the same address in the

13   wallet, in which case it's stored as what's called a UTXO

14   model, which is the unspent transaction outputs is how it's

15   stored on the blockchain.

16        So if two -- I don't know how much in the weeds I should

17   get, Your Honor.

18   Q.    I feel like we're far too deep in the weeds for me

19   already, so -- all right.

20   A.    So to answer your question, it could be two transactions

21   to the same address, which would then be stored on the

22   blockchain as those two inputs.

23        And then when it's spent, anything that's spent from the

24   address has to go from one or both of those inputs.

25        And so even in the same address, you can still make a

10

1   distinction of, all right, if half a bitcoin and then 1.6

2   bitcoin came into the same address, when you spend, you would

3   be able to see if it drew from that half a bitcoin or the 1.6,

4   or the other way of having multiple inputs into a wallet is

5   just having them go to different addresses.

6        And my practice was to use different addresses.  Every

7   input or every deposit was a different address.

8   Q.   Okay.  So if a wallet had multiple addresses within it,

9   are they mixed together?

10  A.   No.  I mean, you could -- you can -- you can

11  differentiate.

12       If you wanted to pull out a specific coin, like say you

13  found out that one deposit has historical value because the

14  person who sent it was famous, you can pull that particular

15  fraction of a coin out from that -- from that wallet and then

16  spend it rather than others.  So it's -- so it's still --

17  Q.   So let me ask it this way --

18       (Parties instructed to speak one at a time.)

19  BY MR. MISHLER:

20  Q.   Let me try to clear it up.  Make it simpler.  I'm

21  thinking like I get a paycheck every week, right?  So my

22  paycheck gets deposited in my bank account.

23       All I see when I open my bank account is a total dollar

24  amount.  I don't see -- I mean, I guess I could see individual

25  deposits, but the dollars aren't linked to a particular

1    deposit, like you are talking about.

2         Is that what makes cryptocurrency different?

3    A.   Yeah, and -- well, it makes bitcoin different.

4         There are other cryptocurrencies that have -- that are a

5    bit more fungible in that regard.

6         Yeah, you would have a list of -- if you want, you can

7    look at the wallet and say this is the total amount.

8         But any time you spend from that, you are going to

9    either have to make a conscious decision of which input it's

10   spending from or you just let the wallet decide at random to

11   just pull in order to add up to the total of whatever you are

12   spending.

13   Q.   Did you ever have wallets that had these bitcoin that

14   are left over that also contained proceeds from your drug

15   trafficking organization?

16   A.   I didn't think so, but then I saw the exhibit.  And it

17   looks like I may have made some deposits that came from the

18   drug trafficking organization, but they would have been stored

19   in a different address, so they are -- you can pull them apart.

20   Q.   So even if they were stored in the same wallet, they

21   were still distinguishable?

22   A.   Yes.  You can definitely trace and link and show, all

23   right, this -- these elicit funds end up going here, and the --

24   the legal funds went here.

25        It's something that's showable, not just by looking at

12

1  the wallet, but you can look on any blockchain explorer on the

2  web or just look at the blockchain itself.

3   Q.   Okay.  The last area I want to get into is mixers.  Can

4  you explain those to us?

5   A.   Because bitcoin is not anonymous, it's pseudonymous, so

6  every address has just a string of characters, and as

7  transactions happen in the world, you don't know who they --

8  who they really belong to.

9       But as soon as you make a link to a person, to an

10  address, from then on, from not only that point in the future

11  you can follow their transactions, but you can also go

12  retroactively and look and see what their entire past financial

13  history is.

14       THE COURT:  On that chain?  Not -- not in general.

15  Just specific to that particular --

16       THE WITNESS:  Well, on that particular one, yes,

17  Your Honor.

18       In this case, bitcoin, the way it works, most

19  blockchains are similar.  It's just some form of distributor

20  ledger technology.  You just look at the ledger of all

21  transactions, and you can see it.

22       Like, for instance, I mean, if you were -- any of you

23  were -- like a dollar transaction at a taco truck that was run

24  by a bad actor, and they wanted to get back at you, the person

25  could say:  "All right.  Well, now that I know this one fifty

13

1    cent or one dollar transaction, I can look and just use

2    artificial intelligence and make a guess, this one address

3    belongs to them, there -- with inputs and outputs, here are the

4    other addresses that are probably in the same wallet."

5         And with a high degree of certainty, this hypothetical

6    bad actor could write a -- a script for a Twitter bot that just

7    says, like, "Hey, Joe Blow has $53,000 in his bank account,"

8    and then every time that person spends from that money, it

9    would just automatically put on Twitter, you know, "Joe Blow

10    has spent $5.  What is he up to?  And he's got $53,000 left."

11         And I would argue that, since that's possible, one of

12    the things that is heavily encouraged in the crypto community,

13    the bitcoin community, and has been since the inception, is to

14    use tumblers and mixers every time you are moving from wallet

15    to wallet because, if you don't, there could be a time that you

16    just, you know, pay for a taco to a bad actor.  You give

17    someone some money, and they then have the ability to look at

18    all your past financial transactions.

19         And I know, in my particular case, I was not very

20    stealth in the beginning because I told everyone that I had

21    bitcoin.  I thought it was the coolest thing.

22         Then when I started to blow up in value, I realized,

23    like, oh, I just made it publicly known that I have what now

24    turns out to be millions of dollars in untraceable funds.

25         And if someone came up with a wrench and said:  "All

14

1    right.  Unlock your phone and give it to me or I'm going to hit

2    you over the head," I had left myself open for that.

3         So I tried to be extra careful to sever the links, that

4    no one could track my transactions over the years.

5    BY MR. MISHLER:

6    Q.   So I guess my question is:  Is a mixer effective or can

7    you still backtrace using all the stuff from the blockchain to

8    trace it back, if you wanted?

9    A.   Yes and no.  There's two kinds of mixers.  I would

10   generalize it as two kinds.

11        There's the one that you send a certain amount of coins

12   in, and then from a different pool, it sends them back.  Those

13   would be like the tumblers, they're called.  So it completely

14   severs the link.

15        And then there are others called either SharedCoin or

16   CoinShare, where it takes a whole bunch of people around the

17   world who are making transactions -- who are making

18   transactions together, it lumps them into one giant

19   transaction, and then has the output.

20        So everyone gets the same amount they put in, but as far

21   as on the blockchain, it just looks like, you know, these --

22   these hundred inputs came to these hundred outputs, and you

23   don't know which one came to which, because it's all just one

24   transaction on the blockchain.

25        And so those, if you have the starting and ending

15

1  wallets and can compare them, you can look in the blockchain

2  just to see if there's any link between the two, and that's

3  with the SharedCoin and the CoinJoin.  With a tumbler, there

4  is -- that link is severed.

5   Q.   Did you ever use a mixer or a tumbler for illegitimate

6  proceeds for your drug trafficking organization?

7   A.   I did.

8   Q.   Did you ever use one for the legitimate cryptocurrency

9  you had?

10  A.   Yes, I did.

11  Q.   Did you ever put legitimate and illicit cryptocurrency

12  in the same transaction in a mixer?

13  A.   In a mixer, no.

14  Q.   Okay.  Is cryptocurrency something you would consider to

15  be unique, like an address or a bitcoin?  Is it a unique item?

16  A.   The address, yes.  One address can only exist in one

17  wallet.  There's not a chance that that same address is in

18  someone else's wallet.

19  Q.   And so if you put -- when you put cryptocurrency in a

20  wallet with other crypto, each transaction is still unique?

21  Each bitcoin is still unique?

22  A.   Yes.

23       MR. MISHLER:  So -- you don't mind if I use your

24  exhibit?

25       MR. HUNTER:  No.

16

1    BY MR. MISHLER:

2    Q.    So you've seen this exhibit, right, that the government

3    plans to use?

4    A.    Yes.

5    Q.    And my understanding is that they are alleging this

6    shows commingling of legitimate and illegitimate

7    cryptocurrency?

8    A.    I think that's the argument, yes.

9    Q.    Does this show that to you?

10   A.    No.

11   Q.    Can you explain why?  You might want to pull -- if you

12   need me to move it, let me know.  No, the monitor so you can

13   see it.

14   A.    I don't know what the argument is going to be from the

15   other side --

16   Q.    Sure.

17   A.    -- but from just what I'm seeing, my take on this, if I

18   could simplify it, so the argument is that --

19           THE COURT:  Wait.  Can I -- if you don't know what

20   their argument is going to be --

21           THE WITNESS:  I know because it's --

22           THE COURT:  -- it's kind of hard to respond to it.

23           MR. MISHLER:  Would you like me to have him go --

24           THE COURT:  You are going to get to do a redirect

25   after Mr. Hunter goes.  Let's not go down a rabbit hole that

1  maybe Mr. Hunter isn't going to lead us into.

2      MR. MISHLER:  That's probably cleaner, Your Honor.

3  Thank you.  I don't have any other questions.

4      THE COURT:  Okay.  Let me ask, and however you guys

5  want to handle this, but -- so I'm looking at pages 6 and 7 of

6  your response to the motion, and so as I understand what it is

7  that you are claiming are not part of the DTO would be this

8  real property in Brighton, Colorado.

9      THE WITNESS:  Yes.

10      THE COURT:  A Tesla, a computer, and the Wealthfront

11  account?

12      MR. MISHLER:  Yes.

13      THE WITNESS:  Yes.

14      THE COURT:  And then we have the real property in

15  Brighton listed, I guess, twice.  That's the legal description.

16  Cardano, which is a wallet, right?

17      THE WITNESS:  It's a different cryptocurrency,

18  Your Honor.

19      THE COURT:  Polkadot and the Wrapped Bitcoin --

20      MR. MISHLER:  Yes.

21      THE COURT:  -- those are the things that you are

22  saying --

23      MR. MISHLER:  Those are the four things we're asking

24  to be taken off of the forfeiture list.

25      THE COURT:  Okay.  So the Tesla and the computer, are

18

1    those on the forfeiture list?

2             MR. MISHLER:  Yes.

3             THE COURT:  They are.  Okay.  And are you asking those

4    to be taken off?

5             MR. MISHLER:  No.

6             THE COURT:  Okay.  So it's the real property, Cardano,

7    Polkadot, and Wrapped Bitcoin?

8             MR. MISHLER:  Yes.

9             THE COURT:  Okay.

10            MR. MISHLER:  Just really quickly, I guess, let me

11   wrap that up.

12     BY MR. MISHLER:

13   Q.   The property in Brighton, how did you pay for that?

14   A.   All -- all four things that I'm asking for back was paid

15   for by -- 150 bitcoin was converted into Wrapped Bitcoin, which

16   is just a bitcoin token on the Ethereum blockchain.

17            And then on the Ethereum blockchain, which is more --

18   which is like a computer that is distributed worldwide so you

19   can use -- do what's called smart contracts, where it's a -- a

20   computer program that acts similar to a bank, only instead of a

21   human making decisions, it's just lines of code.

22            So I took that 150 in Wrapped Bitcoin, locked it into a

23   smart contract which someone had written that used it as

24   collateral to pull out loans against it, so I was pulling out

25   loans at a .5 percent interest rate.

19

1        And with those loans, there was a coin that came out

2    that was equal to $1.  It's called Dai.  So one Dai equals one

3    dollar.

4        So I take out enough in loans to -- and from there, I

5    paid for those four things, or to be more specific, paid for

6    three things.

7        And then while I was in incarceration, the price of

8    bitcoin dipped below what the limit is for that particular

9    smart contract and so it self-liquidated.

10        So it sold its own -- so it sold the -- the extra

11    bitcoin for a 13 percent fee, and there's 25 bitcoin left of

12    the original 150, and the rest was sold to pay off the debts.

13    So now there's no debt.

14   Q.   But you used that bitcoin to get loans to purchase the

15    assets you are seeking to have returned?

16   A.   Yes, yes.  So from those legitimate bitcoin came the --

17    I got the loan and purchased the property in Colorado, and I

18    purchased the almost 500,000 ADA and the Polkadot.

19   Q.   ADA would be Cardano?

20   A.   Cardano, yes.

21       THE COURT:  So the -- so the bitcoin was collateral.

22    How did you pay for the loan?

23       THE WITNESS:  Uh --

24       THE COURT:  To the extent you had a mortgage on the

25    real property, and you had the collateral of the bitcoin, how

20

1    did you pay the payments on the loan?

2          THE WITNESS:  There are -- Your Honor, there are no

3    payments on this particular type of loan.

4          It's just -- it can last indefinitely, and my thought

5    was -- I thought bitcoin would go up, and if it went up enough,

6    I can just sell some of it to pay off the loan.

7          But this particular loan is just a very simple line of

8    code of where it would have, yeah, .5 percent interest, and so

9    that did increase slightly over time, and if it would ever --

10   the loan or the interest overtook the collateral, it

11   self-liquidates.  It sells off the collateral, and it pays off

12   the loan.

13         So my thought was I could just leave it for years maybe.

14   I was wrong in that assumption, in that guess, because when

15   bitcoin crashed, it -- it wiped out that loan.  And since I

16   wasn't able to actively manage --

17         THE COURT:  It's not a mortgage like I'm thinking.

18   It's actually a special bitcoin type of loan that you got for

19   the property and for the Cardano and Polkadot?

20         THE WITNESS:  Yes, Your Honor.  It's just a very, very

21   simplified loan.

22     BY MR. MISHLER:

23     Q.   Since the smart contract was liquidated, are you

24   required to pay anything back for that loan?

25     A.   No.  It's gone.  It's covered.

21

1    Q.    You don't need to give them the property or any of the

2    cryptocurrency?

3    A.    No.  That's just -- at the end of it, it's just like I

4    traded that missing, you know, 125 bitcoin.  That doesn't exist

5    anymore, but the things I got the loan for do, so the Cardano

6    and the Polkadot and the property.

7              MR. MISHLER:  I don't have any other questions.

8              THE COURT:  Thank you.  All right.  Mr. Hunter, are

9    you going to take us down rabbit holes?

10             MR. HUNTER:  I'll try not to do that.

11                             - - -

12                        CROSS-EXAMINATION

13   BY MR. HUNTER:

14   Q.    Good morning, Mr. Barlow.  If I'm correct, did you not

15   admit that you, in fact, did commingle proceeds from your drug

16   trafficking organization with what you are purporting is the

17   innocent 150 bitcoin?

18   A.    "Commingle" as in it was --

19   Q.    Let me clarify that.

20   A.    Yes.

21   Q.    As in you took drug proceeds and you put it into the

22   same wallet with what you are now purporting is your innocent

23   bitcoin.

24   A.    Yes, in the same wallet, but different addresses.

25   Q.    And you claim that you purchased more than 900 bitcoin.

22

1  You've argued that a portion of those were separate from your

2  drug trafficking and money laundering conspiracies, right?

3     A.    Correct.

4     Q.    You are pretty well versed in cryptocurrency and how to

5  set up those established wallets?

6     A.    (Nods head.)

7     Q.    You have to answer.

8     A.    Oh, yes.  Yes, I am.

9     Q.    If you wanted to keep those 900 bitcoin completely

10  separate from your drug trafficking and money laundering

11  conspiracies, you could have done that pretty easily, couldn't

12  you?

13    A.    I could have.

14    Q.    Could you set up a wallet, leave all of that in there,

15  and eventually -- if you ever wanted to cash any of those

16  out -- you just send it to your Coinbase account and to a bank

17  account?

18    A.    Yes, I could have.

19    Q.    That's not what you did though, is it?

20    A.    That's not what I did.

21    Q.    Why did you use mixing services to move your

22  cryptocurrency around from 2014 to 2021?

23    A.    For the legitimate funds, I would have used mixing

24  services just to protect my identity.

25          And then for the other proceeds of the DTO, I would have

23

1    done that to not be identified.

2    Q.   Well, you were using mixing services to put

3    cryptocurrency in your private wallet because you were

4    receiving cryptocurrency as drug payments, right?

5    A.   Say again.  So I was receiving cryptocurrencies --

6    Q.   You were receiving drug payments in cryptocurrency, and

7    you are using mixing services to put some of those funds in

8    your private wallet?

9    A.   Yes, I did.

10   Q.   Yes.  And, in fact, that's what you pled guilty to in

11   Count 2 of the Superseding Information in this case, isn't it?

12   That's your money laundering, right?

13   A.   Yes.

14   Q.   At the time -- when you talk about these 150 bitcoin

15   used to purchase the Colorado property, at the time that those

16   funds came out of your private wallet, they didn't just go

17   directly into a smart contract, did they?

18   A.   Yeah.  They went through an exchange to turn the bitcoin

19   into Wrapped Bitcoin.

20   Q.   Let's talk about that for a second.  Tell me how they

21   went into an exchange.

22        Didn't you send them to an overseas Binance.com account

23   that was not your own?

24   A.   That's correct.

25   Q.   Why did you do that?

24

1    A.    Because as a U.S. person, when I logged into Binance, it

2    said that they -- it said that there were restrictions on my

3    account.

4    Q.    In other words, if you are a U.S. citizen, you are not

5    allowed to use Binance to send money into smart contracts?

6    A.    Or just to use the exchange, that was their company

7    policy.  It's an exchange in China.

8    Q.    So you sent money to the account of a Filipino citizen

9    who was your assistant?

10   A.    Correct.

11   Q.    And you used her account to wrap the bitcoin?

12   A.    Correct.

13   Q.    And then send it?

14   A.    Correct.

15   Q.    And you knew that that was illegal when you did that?

16   A.    Yeah.

17   Q.    You claim that you had at one point nine --

18         THE COURT:  Let me just ask:  So regardless of

19   the purpose -- so regardless of the purpose for which, let's

20   say, he was using the bitcoin money to buy property that was

21   "clean," non -- there was the bitcoin he bought with his

22   retirement account, and he was buying real estate with it, just

23   the fact of sending it overseas to wrap it, that is the wire

24   fraud; is that --

25         MR. HUNTER:  That is money laundering, Your Honor.

25

1       THE COURT:  That is the money laundering.  Okay.

2       MR. HUNTER:  I just wanted to make that clear because

3   in their response --

4       THE COURT:  That's why I'm following up.  I figured

5   that's what you were doing.  I wanted to make sure I understand

6   it.

7       MR. HUNTER:  And in their response, they didn't -- he

8   didn't tell you the story of how the bitcoin went from Point A

9   to Point B.  That's part of the story.

10      THE COURT:  Okay.

11  BY MR. HUNTER:

12  Q.   You claim that you had 900 bitcoin but that basically

13  150 of them were innocent, and that's what you used to make the

14  purchase of the Colorado ranch, the Cardano, the Dai -- spelled

15  D-a-i -- and the Polkadot cryptocurrency, correct?

16  A.   Correct.

17  Q.   So if you had 900 bitcoin in 2012, in between 2014 and

18  2021, you spent approximately, by my math, 750 bitcoin.

19      What did you spend it on?

20  A.   A lot of it was spent earlier on, when it was worth

21  less.  So, you know, I -- I took profits to cover my original

22  investment of 10,000, and I -- and, again, this is off -- going

23  off memory.

24      I don't have these records -- I have not had these

25  records in front of me, but that would have been one or two

26

1    hundred.

2         For the Tesla that I bought, I paid 287 bitcoin for it.

3    And some of it came from the pre-DTO funds, and other stuff

4    came from proceeds of the DTO.

5    Q.   Well, during that time from 2014 to 2021, you are

6    operating a drug trafficking conspiracy and organization that

7    employed at least a dozen other people over that time, right?

8    A.   Correct.

9    Q.   And you are incurring expenses in running that drug

10   trafficking organization, right?

11   A.   I did, yes.

12   Q.   Doing things, like you are buying equipment?

13   A.   Eventually I did, yes.

14   Q.   The chemicals to make the psilocybin analogue?

15   A.   Simplified, but yes.

16   Q.   Mailing supplies in order to send out those -- your

17   orders?

18   A.   Correct.

19   Q.   Packaging materials?

20   A.   Correct.

21   Q.   Computers?

22   A.   Correct.

23   Q.   You got to pay for internet services so you have a

24   connection?

25   A.   Correct.

27

1   Q.   Several residences that either you are living in or

2   other people are living in, paying rent on those?

3   A.   I paid my rent at the house that I'm staying in, but

4   then my employees would get a paycheck, and they would

5   presumably use that to pay their rent, yes.

6   Q.   Mail delivery services to actually deliver your product.

7   You have to pay for that stuff, right?

8   A.   Yeah, stamps.

9   Q.   Fuel to drive your packages to the post office and drop

10  them in the blue boxes?

11  A.   Correct.

12  Q.   Travel to facilitate, for example, your overseas

13  supplier, you had to travel over there, right?

14  A.   Uh-huh.

15  Q.   You had to pay for that?

16  A.   Yes.

17  Q.   You also had to actually pay the employees that were

18  working for you, didn't you?

19  A.   Yes.

20  Q.   Weren't you typically doing that with bitcoin?

21  A.   Yes.

22        MR. HUNTER:  I don't have any additional questions,

23  Your Honor.

24        THE COURT:  Okay.  Thank you.  Mr. Mishler?

25        MR. MISHLER:  Very quickly, Your Honor.

28

1    THE COURT:  Sure.

2                         - - -

3                    REDIRECT EXAMINATION

4    BY MR. MISHLER:

5    Q.    All of those costs Mr. Hunter talked to you about, where

6    did you get the crypto for that?

7    A.    From the DTO.  I mean, when I first -- the first couple

8    of years that I did it, I don't know if it still would be

9    called a DTO 'cause it was just me.

10          I just grow mushrooms and sell them.  And, you know, the

11   costs are just time, and I would say maybe 60, 70 cents of

12   equipment and supplies turn into $20 of product.

13          And so just with that kind of profit margin, I had

14   enough, after even just a few months, to start -- you know, it

15   would pay for stamps.

16          And then, so by the time it came to buy equipment or to

17   have employees, there was plenty of untouched bitcoin that came

18   from selling mushrooms online that I could use for all that

19   stuff.

20   Q.    Did you ever use legitimate cryptocurrency for those

21   supplies?

22   A.    No.

23   Q.    Not the --

24   A.    I mean, I started with -- I think it was like $15.  I

25   bought some spores online.  And then on Amazon, I got Mason

29

1    jars, vermiculite, brown rice flour, and a pressure cooker,

2    so -- like $250 total.  And since I bought it on Amazon, it

3    wouldn't have been with bitcoin because at the time Amazon

4    didn't have a way to cash it out, so it would have come from

5    just my personal savings.

6      Q.   So basically the 800 bitcoin that you sold, before the

7    150 that's left, none of that was used for the drug trafficking

8    organization?

9      A.   No.  There would be no need for that.

10         MR. MISHLER:  Thank you.

11         THE COURT:  Thank you.  You may step down, Mr. Barlow.

12   Thank you.  Mr. Mishler, anything further?

13         MR. MISHLER:  No, Your Honor.  Thank you.

14         THE COURT:  Mr. Hunter?

15         MR. HUNTER:  Your Honor, I would call Special Agent

16   Greg Libow.

17         THE COURT:  Sir, if you will step forward.

18      (Witness sworn.)

19                          - - -

20                       GREGORY LIBOW

21    Called as a witness on behalf of the Plaintiff, being first

22   duly sworn, testified as follows:

23                     DIRECT EXAMINATION

24   BY MR. HUNTER:

25      Q.   Good morning, sir.

30

1   A.   Good morning.

2   Q.   Could you please state your name and spell it for the

3   record?

4   A.   Gregory Libow.

5   Q.   Sir, how are you employed?

6   A.   I am a special agent with Homeland Security

7   Investigations.

8   Q.   What's your current duty assignment?

9   A.   I am on the Darknet Narcotics Task Force.  We

10  exclusively investigate Darknet narcotics drug trafficking.

11  Q.   Is that here in the Southern District of Ohio?

12  A.   It is.

13  Q.   Can you tell the Court just what your general duties are

14  as part of that task force?

15  A.   We mostly investigate Darknet vendors, the people who

16  sell the drugs on the Darknet market, as well as the Darknet

17  markets themselves.

18  Q.   And do you do crypto tracing?

19  A.   I do.

20  Q.   Do you do computer forensic review?

21  A.   Review.  We don't do -- I don't do the actual forensics

22  on the computer.

23  Q.   Are you familiar with the investigation into the

24  James Barlow drug trafficking organization?

25  A.   I am.

31

1   Q.   What was your role in that investigation?

2   A.   I was one of the lead investigators.

3   Q.   Did you investigate Mr. Barlow's financial accounts?

4   A.   I did.

5   Q.   Did you ever conduct a review of the forensic

6   examination of computer equipment seized from Mr. Barlow?

7   A.   I did.

8   Q.   And can you just give the Court the -- a notion of what

9   that entails?

10  A.   So our forensics agents will take an image of the

11  computer.  Us, as the agents, will then review the image.  That

12  includes like emails, files on the storage devices, his wallets

13  that were connected to the computer, and so forth.

14  Q.   And can you estimate for the Court approximately how

15  much time you spent going through Mr. Barlow's computers, his

16  financial accounts?

17  A.   Oh, hundreds of hours.  He had a huge amount of

18  terabytes of storage on his devices.

19  Q.   And did that work entail you conducting tracing of funds

20  in cryptocurrency utilized by the Barlow drug trafficking

21  organization?

22  A.   Yes.

23  Q.   Can you describe for the Court what you do in tracing?

24  A.   Yes.  So we will -- the government has a pool of seized

25  marketplace data.

32

1          So when we take down a Darknet market, as the U.S.

2     government, we retain the data from that market and unencrypt

3     it, and we will get things like withdrawal and deposit

4     addresses for vendors from that market, which would be what the

5     vendor then puts onto the market to have them send him his

6     proceeds once he's made a drug sale.

7     Q.   And just give the Court an example of what kind of a

8     market would be seized and how you would start doing tracing

9     from that.

10    A.   Yeah.  So one example would be like AlphaBay market,

11    which was a large market that TripWithScience was on as well.

12         So to give an example with TripWithScience would be

13    that, you know, if he were to sell on AlphaBay market, he would

14    have to put a withdrawal address in, which would allow AlphaBay

15    to send the funds from his proceeds once he sold drugs on that

16    market.

17    Q.   And then you could review that and trace those funds

18    back?

19    A.   Correct.

20    Q.   Are you familiar with the wallets that Mr. Barlow

21    utilized to store and transfer his cryptocurrency between

22    2014-2021?

23    A.   Yes.

24    Q.   Can you estimate for the Court how many wallets we're

25    talking about?

33

1    A.    Oh, there's like hundreds of wallets.  He was constantly

2    creating new wallets.

3    Q.    Were some of those directly traceable to the

4    TripWithScience drug organization?

5    A.    Yes.

6    Q.    And were some of those what you would deem as a private

7    wallet of Mr. Barlow?

8    A.    Yes.

9    Q.    In anticipation of today's hearing, did you review

10   Mr. Barlow's response to the government's motion for a

11   preliminary order of forfeiture?

12   A.    I did.

13   Q.    Did you prepare an exhibit and some testimony here today

14   as a result of reviewing that response?

15   A.    I did.

16   Q.    Can you describe for the Court what you did after

17   reading that response and how you prepared an exhibit?

18   A.    Yeah.  I went ahead and plugged in those wallet

19   addresses that he had mentioned in the response and traced them

20   backwards and matched them up with the data we already had.

21        We're very familiar with those addresses because it was

22   150 bitcoin that moved at the last minute for us, so we had to

23   trace that to figure out where it went, and that was quite a

24   mission with it being going to his assistant's account.

25   Q.    When you say there was 150 bitcoin that was moved at the

34

1 last minute, what do you mean?

2    A.   Right before we were about to arrest him -- Mr. Barlow

3 didn't know we were about to arrest him, so he didn't move it

4 for that reason.

5       But right before we were about to arrest him,

6 150 bitcoin just vanished from a wallet that we were watching

7 that was just sitting there for quite a while.

8    Q.   So you are familiar with that wallet?

9    A.   Yes.

10    Q.   And so what kind of an exhibit did you prepare today?

11    A.   Yeah, I prepared that -- that tracing that we just

12 talked about, the -- a diagram that shows where the funds

13 originated from for that wallet.

14       It's done with Chainalysis, which is one of the programs

15 that Mr. Barlow references as reputable in his response.

16    Q.   I'm going to show you what's been marked as Government's

17 Exhibit A.  I'm going to focus on a particular portion of this.

18       Can you see that okay?  Can everybody see that okay?

19 Can you see that okay?

20    A.   Yeah.  It's cutting off a little bit at the very end, if

21 you want --

22    Q.   Do you recognize this and, if so, what is it?

23    A.   I do.  This is that chart showing the tracing.  I know

24 it looks intense probably, but I'll go ahead and explain it to

25 you guys as we go further on.

35

1    Q.   First of all, I'll just kind of point you to right -- do

2  you have the screen where you can mark?

3       I'll point you right to the middle what is called the

4  James Barlow private wallet.  Do you see that?

5    A.   Yes.

6    Q.   What is that?

7    A.   That is an Electrum wallet that Mr. Barlow was referring

8  to in his testimony just now.  It is a wallet that he was

9  using.  I believe it was linked to his Trezor, and he was using

10  it to hold the 150 bitcoin in question.

11    Q.   Was -- what we've marked here as the James Barlow

12  private wallet, was that used to supply the cryptocurrency and

13  funds to buy the Brighton, Colorado, property, and the

14  cryptocurrency described in Mr. Barlow's response, particularly

15  the Cardano, the Dai, the Wrapped Bitcoin?

16    A.   Yes.  All those funds came from that wallet.

17    Q.   We will come back to that in just a second.  Can you

18  clear that?

19    A.   Yeah.

20       THE COURT:  Could I ask just a very simplistic

21  question?

22       Is the dispute about -- at least what I heard Mr. Barlow

23  say is that, yeah, he had lots of things in his wallet, and he

24  used that wallet for both legitimate and illegal purposes, and

25  I think what his argument is, that it's that -- within that

36

1   wallet, there's different nonfungible dollars and that he had

2   nonfungible dollars that he didn't use illegally?

3        MR. HUNTER:  Yeah.

4        THE COURT:  So to the extent that you are asking about

5   it, was the wallet itself used for purchasing items for the

6   DTO?  He acknowledges that.  I -- you are shaking your head no.

7        I thought you said you did acknowledge that, but it --

8   because of the way the addresses were, there were addresses

9   within the wallet that could be carved out.

10       Am I -- is that not right?

11       Stand up if you are going to talk to me.

12       THE DEFENDANT:  Yes, ma'am.  Just to clarify, this

13  wallet was one that I used for personal funds, and I did not

14  think I had any DTO funds going into this wallet.

15       But this chart shows that I made some mistakes, and some

16  DTO funds did go into that wallet.  But this is one that I

17  used, yeah, for personal funds and for personal purchases

18  and -- yeah, something from this wallet would never have gone

19  into purchasing anything for the operation, Your Honor.

20       THE COURT:  Well, I think the agent just testified

21  that they did trace money from that wallet that was used for

22  the DTO.  Is that what you said?

23       THE WITNESS:  No.  That he received funds from the

24  market to that wallet.

25       THE COURT:  Oh, okay.  You received funds from the

37

1     market to that wallet.  Okay.  Okay.  I'm sorry.  Go ahead.

2              MR. HUNTER:  Your Honor, we'll develop this a little

3     further as to why those -- it's not quite as fungible as it

4     sounds.

5              THE COURT:  Or nonfungible as it sounds?

6              MR. HUNTER:  Right.

7        BY MR. HUNTER:

8        Q.   I'm going to -- can you indicate on there, on the

9     exhibit to the left, what we have indicated was the

10    TripWithScience wallet?  Can you indicate that for the Court?

11       A.   Yes.

12       Q.   It has a little nameplate above it where we have kind of

13    named that the TripWithScience wallet?

14       A.   Correct.

15       Q.   Can you explain to the Court what that is?

16       A.   Yeah.  That is a wallet.  Like Mr. Barlow explained, the

17    wallet has several addresses in it.

18              Several of those addresses were attributed as withdrawal

19    wallets on Darknet markets or used as withdrawal wallets on

20    Darknet markets.

21              So they were -- the addresses he linked to the market to

22    have them send him the illicit funds.

23       Q.   Is it accurate to say that the TripWithScience wallet

24    was receiving drug proceeds from the dark web drug markets

25    during the time frame of 2014 to 2021?

38

1    A.    Yes.

2    Q.    Can you use the chart and explain that to the Court?

3    A.    Yeah.  So as you can see here, here, and here, excuse my

4    terrible circling, as you can see from those three red circles,

5    those are Darknet markets.

6          You can see that funds go directly from those Darknet

7    markets into the wallet in question here.  There's also three

8    additional Darknet markets that sent funds directly to him.

9    They are not on the chart.

10         These were the most pertinent ones.

11         It was already big enough, the chart, that I didn't want

12   to clutter the screen more.

13   Q.    Can you tell the Court approximately how many Darknet

14   markets put drug proceeds into the TripWithScience wallet?

15   A.    Yeah.  So there were six Darknet Markets that put

16   proceeds into the market.  It was a total of 80 percent of the

17   funds that wallet received came from Darknet markets.

18   Q.    And can you -- if you can, how many transactions from

19   these Darknet markets went into the TripWithScience wallet?

20   A.    761 transactions.

21   Q.    And if you can tell, so how many bitcoin went from these

22   Darknet markets, drug proceeds, into the TripWithScience

23   wallet?

24   A.    586 bitcoin.

25   Q.    Did funds from or cryptocurrency from a TripWithScience

1    wallet ever travel from the TripWithScience wallet into what

2    we've marked as the James Barlow private wallet?

3    A.    Yes, this middle transaction that you see here.

4    Q.    Go ahead and clear that.

5    A.    Okay.  I've cleared that, make it less -- this one going

6    to here, what we're seeing there is a transaction that happened

7    within a month period.

8         He sends 15 -- 17 bitcoin to this address, sends it

9    again to this address.  Then he splits off 5 of it, sends it to

10   his Coinbase account, and sends the additional 12 over to this

11   wallet.

12        He combines another 12 bitcoin with it, but never takes

13   any money out of it, and moves it over to his wallet in

14   question.

15   Q.    Just to be clear, is that drug proceeds directly into

16   the private wallet?

17   A.    It is, yes.

18   Q.    Can you explain to the Court what a mixer or a mixing

19   service is, kind of in your own words?

20   A.    Yeah.  I mean, Mr. Barlow was pretty on with what he

21   explained.  It's a service where customers will pay to send

22   their bitcoin to a wallet of the mixing service.

23        The mixing service will then send it through multiple

24   wallets and commingle it with other people's funds and then

25   send out the -- a certain amount agreed upon to his personal

40

1    wallet for a fee.

2    Q.    Were funds or cryptocurrency from the TripWithScience

3    wallet ever sent to mixing services?

4    A.    Yeah.  At least it was -- to be exact, it was 49 percent

5    of it.

6    Q.    How many different mixing services got funds from the

7    TripWithScience wallet?

8    A.    Two mixing services directly, as you can see here, but

9    then there was an additional seven indirectly, which

10   "indirectly" means at least one other wallet.

11        It was moved through at least one other wallet before it

12   was sent to the mixing service.

13   Q.    Did funds from the TripWithScience wallet that got sent

14   to the mixing services ever end up in the James Barlow private

15   wallet?

16   A.    I can't -- because of the way mixing services work, I

17   can't say for sure that these exact funds were sent to his

18   wallet, but I can say that he sent funds to these mixing

19   services, and these same mixing services sent funds to his

20   private wallet.

21        But because of the nature of the mixing service, you

22   can't pinpoint exactly.

23   Q.    How many different transactions occurred where money

24   that was -- how many different transactions where money from

25   mixing services went into the James Barlow private wallet?

41

1    A.    Went to James Barlow's private wallet?

2    Q.    Yeah.

3    A.    Roughly 78, indirectly.  So by "indirectly," I mean --

4    several more are more direct, which they go straight from a --

5    like where we're talking about -- where they go straight to the

6    mixer.

7          And then "indirectly" would be an example of something

8    like this, where it goes to at least two wallets and then goes

9    to the mixer, if that makes sense.

10   Q.    And then how many total bitcoin, if you can say, came

11   from mixing services and then went into the James Barlow

12   private wallet?

13   A.    James Barlow's private wallet received 380 bitcoin from

14   mixing services, 35 percent of the wallet.

15         And just to further elaborate on that, his

16   TripWithScience wallet sent 236 bit -- 365 bitcoin to mixing

17   services.

18         So 365 bitcoin from the TripWithScience wallet went to

19   mixing services, and we know 308 bitcoin come out of mixing

20   services and go into his private wallet.

21   Q.    So having prepared the testimony for today, is the

22   cryptocurrency that's in James Barlow's private wallet

23   commingled with drug proceeds?

24   A.    Yes.

25   Q.    Explain why.

42

1   A.   That is a wallet that has received, as we've shown

2   there, has received funds from Darknet markets and as well as

3   mixing services, that we know he uses mixing services to

4   conceal drug proceeds.

5   Q.   Can you clear the screen?

6   A.   Yeah.

7   Q.   Are you familiar with the -- what we'll call the Binance

8   smart contract Coinbase transaction that Mr. Barlow used to

9   purchase the Brighton, Colorado, property and the

10  cryptocurrency, like Cardano, Dai, Polkadot?  Are you familiar

11  with that?

12  A.   Yeah, I'm very familiar with that.  It created quite the

13  panic for us.

14  Q.   Oh.  Did cryptocurrency used to finance those purchases

15  come from what we've marked as the James Barlow private wallet?

16  A.   Yeah.  And you can see it right here on this chart.

17  This example -- this -- this line right here that we're talking

18  about, that is the 150 bitcoin that he's referring to.

19  Q.   Can you explain to the Court how that transaction that

20  ultimately results in the purchase of the Brighton, Colorado,

21  property, and the other cryptocurrency Mr. Barlow mentioned in

22  his response, can you explain to the Court how that happened?

23  A.   Yeah.  So Mr. Barlow sends 150 bitcoin.  It's like in

24  three separate wallets, 50 bitcoin each, into a Binance

25  account.

43

1       We subpoena Binance.  We find out it belongs to Lea, who

2  we know is James Barlow's personal online assistant.  He then

3  converts it to Wrapped Bitcoin, like he says, sends it to a

4  MetaMask wallet, which he links to an Oasis.app contract, which

5  is the smart contract he refers to.

6       He's using that 150 Wrapped Bitcoin as collateral in a

7  smart contract so that they will print out or mint Dai coin for

8  him.

9       He will then -- he then sends the Dai coin -- he

10  attempts to send the Dai coin all at once, at least 1.5 million

11  worth to his Coinbase account.

12       Coinbase rejects it, says, "Hey, you can't send

13  $1.5 million at once to our account."

14       And we can tell this through emails that we saw on his

15  computer.

16       So what he does is he tries it again at a lower rate

17  until he finally settles on about 50,000, which Binance --

18  Coinbase allows him to do.

19       He then over the course of the next month or so makes

20  several transactions to finally get to that 1.5 million that he

21  needs to pay for the property.

22       And in the email, he also explains to the realtor that

23  he's having trouble liquidating his cryptocurrency, that the

24  payment will be soon.

25  Q.   Let me back you up for just a second.

44

1      When Mr. Barlow sends the 150 bitcoin from his wallet to

2  Ms. Viloria's Binance account in the Philippines, anything

3  strike you about that?

4   A.   Yeah.   As a U.S. citizen, you are not allowed to have a

5  Binance.com account.   The main reason is because they don't

6  have the Anti-Money Laundering Act that the United States

7  requires.   They have been in trouble for this before.   They are

8  blacklisted by the United States.   Yeah.

9      So they can't -- they have a Binance.us option, which

10  U.S. citizens could use.   He chose not to do that.   He chose to

11  go through that dot-com, which is not allowed by a U.S. citizen

12  to use, and used it under someone else's identity.

13   Q.   Does all of this 150 bitcoin, as it's been converted

14  into Wrapped Bitcoin and converted into Dai, does all that

15  eventually end up in Mr. Barlow's Coinbase account?

16   A.   1.5 -- 1.6 million does.

17      It also ends up in his Celsius account.   A portion of it

18  ends up -- so if you see here, this is Celsius.   I can't say

19  what this is over here.   A portion of it ends up in his Celsius

20  account as well is the simple way to say it.

21   Q.   A couple of last questions.

22      Would Coinbase have been able to determine at least some

23  portion of these funds came from the James Barlow private

24  wallet?

25   A.   If he was -- oh, okay, in the current state in which he

45

1   did it?

2      Q.   Yeah.

3      A.   No.  Because he used a person's Binance account.  They

4   do do their own tracing to basically comply with the Anti-Money

5   Laundering Act.  They do their own tracing.

6           But even if they were to trace it, they wouldn't be

7   able -- they don't have subpoena power.  So once it went from

8   the Binance account, they wouldn't have been able to see where

9   it came from or where it originated.

10     Q.   And this might be an obvious question, but would

11  Coinbase then have been able to determine that some of the

12  funds that came from the James Barlow private wallet also

13  originated from the TripWithScience wallet which was receiving

14  proceeds from the dark web?

15     A.   Yeah.  Depending on their skill, yeah, they could

16  determine that.

17          MR. HUNTER:  I don't have any additional questions,

18  Your Honor.  Thank you.

19          THE COURT:  Thank you.  Mr. Mishler, any questions?

20          MR. MISHLER:  I'll try, Your Honor.  I'm starting to

21  get a headache.  Sorry.

22                         - - -

23                    CROSS-EXAMINATION

24  BY MR. MISHLER:

25     Q.   So you created this chart.  That's my understanding.

46

1    A.   Yes, I created it.

2    Q.   Okay.  How long did it take you to create this chart?

3    A.   Well, probably a couple hours.

4    Q.   Okay.  You were pretty careful to make sure you got

5    accurate information on here?

6    A.   Yeah.

7    Q.   Is everything correct on here?

8    A.   I mean, there are wallets off of this chart.  This is

9    not the full span of the money being sent because that would be

10   really hard for everyone to read, and it would just point at a

11   bunch of stuff that may not be relevant in the cases.

12   Q.   Correct.  But what is displayed is accurate?

13   A.   Yes.

14   Q.   Okay.  So let me draw your attention to this transaction

15   here (indicating).  Do you see the one I'm talking to?

16   A.   The Appletits on Hansa Market?

17   Q.   Yeah.  How much was the transaction from that wallet to

18   what has been referred to as James Barlow's personal wallet?

19   A.   I can't say the exact number on the screen.  It looks

20   like -- if you want to guess, it looks like 38,000.

21   Q.   Okay.  I haven't had this chart for very long.  I'm

22   really sorry.

23   A.   Yeah.  No problem.

24   Q.   I apologize.  It's not this transaction.  It's the one

25   above it here.

47

```
 1    A.    Yes.

 2    Q.    Do you see that one?

 3    A.    Yes.

 4    Q.    How much is that transaction between that wallet and

 5   Mr. Barlow's wallet?

 6    A.    So, once again, it's blurry.  I'm going to go with 53,

 7   because I'm looking at a screen.

 8    Q.    I understand.

 9    A.    Around 53,000.

10    Q.    That's what I show as well.

11          So I'm going to show you -- I don't even know how to

12   describe -- that's perfect.

13          Does this look like that wallet address that we were

14   just looking at on your sheet?  It's referenced as -- oh, my

15   God, 1KG --

16          THE COURT:  He can't see it either.  So if you are

17   going to represent that it is -- because I can't see it and

18   I've got the hard copy.

19          THE WITNESS:  I can see that one.  It's the one I

20   underlined.  I can see that.

21    BY MR. MISHLER:

22    Q.    That's the same wallet that we're talking about, the

23   transaction on your sheet about, right?

24    A.    Can I see the chart?

25          MR. WILLIAM BROWN:  Your Honor, may I?
```

48

```
 1            THE COURT:  Yeah, you may.

 2            THE WITNESS:  Sorry.  Yeah.  That appears to be the

 3   same wallet.

 4     BY MR. MISHLER:

 5     Q.   Okay.  And what is this transaction?  There's only two

 6   transactions for this blockchain, correct?

 7     A.   Yeah.

 8     Q.   And what is this transaction?

 9     A.   What -- what do you mean, "What is the transaction?"

10   Like what's the amounts?

11     Q.   Yes.

12     A.   It's on 5/26/2017 he received .01626631 bitcoin.

13          And to save you guys from hearing it again, he sends the

14   same amount out, it looks like, roughly a month later.

15     Q.   Okay.  And do you know what the price of bitcoin was on

16   the day of this transaction?

17     A.   I don't.

18     Q.   Would it surprise you to know that this .16 bitcoin,

19   this transaction was valued at $41?

20     A.   Would it surprise me?  It would, but -- yeah, it would

21   surprise me, I guess.  I don't know honestly.  I don't know

22   what bitcoin is worth.  I --

23     Q.   I'm only -- I'm asking because --

24            THE COURT:  Wait.  One at a time.

25     Q.   I'm asking because you have it listed as a $53,000
```

49

1   transaction.

2    A.    Yeah.   That's Chainalysis.   They list it by value.   You

3   can also list it by bitcoin amount too, which we could have

4   done.

5         It would have probably showed this number that you're

6   referring to.   It could just be a miscalculation in the value.

7   It also could be a miscalculation on Blockchair.com.

8    Q.    Okay.

9         THE COURT:   Let me understand.   You can't be subtle

10  with me.

11        So what you are saying, Mr. Mishler, is that according

12  to Blockchair.com, that the value of that bitcoin was only $41,

13  but the chart says it's $53,000?

14        MR. MISHLER:   Yes, Your Honor.

15        THE COURT:   Where did you get the $53,000 value?

16        THE WITNESS:   That came from the software we used.

17        THE COURT:   What software is that?

18        THE WITNESS:   Chainalysis.

19        THE COURT:   Okay.

20   BY MR. MISHLER:

21   Q.    Let me ask you:   What's the all-time high price of

22  bitcoin?

23   A.    The all-time was around 63,000.

24   Q.    Okay.   So .16 of bitcoin could never be worth $53,000

25  then.

50

1    A.    You're asking me to do math.

2    Q.    That's pretty simple math, I think.

3    A.    Yeah.  I mean, not for me.

4    Q.    At most, it could be 6,000-ish.

5    A.    Okay.

6    Q.    Does that sound -- so is the $53,000 a mistake?

7    A.    The value?

8    Q.    Yes.

9    A.    It could be a mistake, yes.

10   Q.    Okay.  Thank you.

11   A.    But the amount of bitcoin, it would still reflect on the

12   chart.

13   Q.    Right.

14   A.    Okay.

15   Q.    Thanks.  So -- I apologize.  This is the only example I

16   have because I -- I haven't had a lot of time with this.  I,

17   unfortunately, spent a lot of time just traveling to get here.

18        But this gives me some concern that there might be other

19   mistakes on your chart as well.  Is that a possibility?

20   A.    In regards to the value of the bitcoin?

21   Q.    Yes.

22   A.    In regards to the value, I -- I guess it could be

23   possible.

24   Q.    Okay.  Would something like that be pretty important for

25   the discussion we're having?

51

1    A.    No.   Not necessarily, because the bitcoin amount would

2    still be the same.   And if we're just here showing whether

3    funds were commingled or sent to the wallet, it wouldn't be

4    relevant the value.

5    Q.    Okay.   Thanks.

6    A.    You are welcome.

7    Q.    Well, let me ask you about the commingling.   When

8    somebody mixes using a mixer, it -- I'm trying to make this as

9    simple as possible -- it appears to me that that masks the

10   source of the funds that are being deposited; is that right?

11   A.    It "masks the source of the funds being deposited"?   You

12   mean the origins of the funds?

13   Q.    Yes.

14   A.    Yes.   It would mask the origins of the funds.

15   Q.    Mixing doesn't change the unique nature of bitcoin, the

16   bitcoin blockchain address, right?

17   A.    I would need -- I'm not quite sure what you mean by

18   that.

19   Q.    I mean, each bitcoin has a unique identifier, a

20   blockchain address that you can trace?

21   A.    The bitcoin itself?

22   Q.    Yes.

23   A.    No.   Like, the transactions do.   Is that what we're

24   referring to?

25   Q.    Maybe that's what I'm referring to.

52

1    A.    There will be a transaction when it comes out of the

2    mixer which is unique to that transaction, but the bitcoin

3    itself wouldn't have a unique identifier to follow it around

4    with.

5    Q.    So you -- you testified that when proceeds from the

6    TripWithScience wallet were placed into James Barlow's personal

7    wallet address, that was commingling?

8    A.    I said -- yes, there is a -- that the wallet received

9    funds from the Darknet markets, yes.

10    Q.    Yes.

11    A.    The wallet.

12    Q.    But in that wallet, you could still tell which funds had

13    come from the Darknet?

14    A.    The way our software works, we can see that that private

15    wallet received funds from the Darknet.

16          MR. MISHLER:  Okay.  Thank you.  I don't have any

17    other questions.

18          THE COURT:  Any redirect?

19          MR. HUNTER:  Briefly, Your Honor.

20                            - - -

21                    REDIRECT EXAMINATION

22    BY MR. HUNTER:

23    Q.    Special Agent Libow, have you ever purchased

24    cryptocurrency?

25    A.    Yes.

53

1    Q.    Can you explain to the Court how you did that?

2    A.    Yeah.  So, for instance, on Coinbase, I would go put my

3    personal information in, link my bank account, deposit money

4    from my bank account to Coinbase, purchase the cryptocurrency.

5          I don't trust the markets or the exchanges like most

6    people, so I would then move it on to a private wallet.  In

7    this case, I prefer Exodus, but, yeah, I move it to my own

8    wallet from there.

9    Q.    Before you would take your cryptocurrency that you

10   purchased and move it to a private wallet, did you ever send it

11   through a mixing service?

12   A.    No.

13         MR. MISHLER:  Objection.

14   BY MR. HUNTER:

15   Q.    Why not?

16   A.    I -- I -- I would not need -- there's no need for me

17   personally, that I see, that you would conceal where the

18   origins came from.

19         If it came from Coinbase, there's no point in hiding

20   that.  So, no, I wouldn't put it through a mixer and pay a fee

21   for that reason.

22   Q.    What are the fees?

23   A.    They can vary.  I wouldn't want to give an exact number

24   personally just because I don't know what they are right now or

25   what they were, but I know that they can be pretty high, is all

54

1    I can say, but that's an opinion.

2              MR. HUNTER:  Nothing further, Your Honor.

3              THE COURT:  Okay.  That was arguably beyond the scope

4    of your cross.  Do you have any questions?

5              MR. MISHLER:  I don't think it was relevant, so I

6    don't need to.

7              THE COURT:  Okay.  Thank you, Agent.  You may step

8    down.

9              THE WITNESS:  Thank you.

10             THE COURT:  Mr. Hunter, anything further?

11             MR. HUNTER:  The Court's indulgence for just a second.

12   Oh, I suppose I should move to admit Government's Exhibit A.

13             THE COURT:  Sure.

14             MR. HUNTER:  The rest is just argument, Your Honor.

15             THE COURT:  Okay.  Well, let's take just a five-minute

16   break, and we'll have that argument, and then what I would like

17   to do is -- we'll have the argument.  We'll take another break,

18   because I would like to see counsel -- and if Mr. Barlow wants

19   to come back -- I would like to talk to you in the robing room,

20   and then we'll do this -- and then we'll go right into the two

21   sentencings.  Okay.  Thank you.

22             DEPUTY CLERK:  All rise.

23        (Recess taken from 10:10 a.m. to 10:16 a.m.)

24             THE COURT:  All right.  Mr. Mishler, any final

25   arguments?

55

1    MR. MISHLER:  Your Honor, I think the testimony has

2    been very clear that cryptocurrency by its nature is unique and

3    easily identified.

4        The fact that it's in a wallet doesn't necessarily

5    commingle it with other funds from illicit proceeds in the

6    wallets.

7        THE COURT:  Which goes back to my question before.

8    Isn't it your argument that, okay, maybe now that you've seen

9    this chart, Mr. Barlow remembers that proceeds from the drug

10   trafficking organization did go into this particular wallet --

11       MR. MISHLER:  Yes.

12       THE COURT:  -- but because the cryptocurrency itself

13   is distinct from each other, that you can go in and look at the

14   wallet and say this particular line of cryptocurrency came from

15   this source, and this particular line of the cryptocurrency

16   came from that source?

17       MR. MISHLER:  Yes.

18       THE COURT:  That's your argument, right?

19       MR. MISHLER:  Exactly.

20       THE COURT:  Okay.  So -- but then what the government

21   says is -- well, I don't think you are necessarily conceding

22   that -- but to the extend there might be a concession from the

23   government, what the government says is, okay, but even to the

24   extent we had "clean," I'll put those in quotes, "clean"

25   crypto, Mr. Barlow took that "clean" crypto and laundered it

56

1    using the Philippine assistant and other mixers, and that

2    itself is the second element of the offense to which Mr. Barlow

3    pled guilty, and that's the money laundering offense.

4         So even if the original source was legitimate, he

5    laundered it and that in and of itself is a separate federal

6    crime.

7         MR. MISHLER:  So if it is clean cryptocurrency from

8    the beginning, you can't money launder clean money.  It's --

9    the reason he moved it to the Philippines in his assistant's

10   name is to get around a website's terms of use.

11        He wasn't avoiding a federal crime by doing that.  He

12   was gaming a website to invest on their website and get a loan

13   through their website that they wouldn't let him because he was

14   a U.S. citizen, because of their terms of use, not a federal

15   law.

16        THE COURT:  Okay.

17        MR. MISHLER:  So he didn't do it to launder money.  He

18   did it to get the loan he wanted.

19        THE COURT:  Okay.

20        MR. MISHLER:  The money laundering, Count 2, that

21   transaction was never discussed as part of that -- that proffer

22   or the facts for that -- that charge.

23        THE COURT:  Okay.  Anything else?

24        MR. MISHLER:  I think you understand the argument that

25   they are unique.  So I won't give you my colloquial story about

57

1    safes and jewelry in the safe.  I think you understand.

2           THE COURT:  I like the idea.  That's a good analogy.

3    If the jewelry is safe in the safe, then it can be traced.  Is

4    that right?

5           MR. MISHLER:  Yes.

6           THE COURT:  Good.  I understand cryptocurrency.

7         Mr. Hunter?

8           MR. HUNTER:  Thank you, Your Honor.

9         Your Honor, the government's position is that we've

10   established -- he -- certainly, Mr. Barlow has failed to carry

11   his burden of establishing that these funds weren't commingled

12   at the very least.

13        I think the evidence supports that these were the

14   proceeds -- let me use my forfeiture language here -- that were

15   involved in and/or facilitated the crimes with which Mr. Barlow

16   has pleaded guilty to.

17        In essence, I think what Mr. Barlow is saying:  This is

18   how I think we can show that this is unworkable.

19        If you are saying that each individual cryptocurrency

20   has some serial number -- for lack of a better term -- assigned

21   to it, that would be the same as saying every dollar bill has a

22   specific serial number assigned to it, and so I've got a

23   million dollar bills sitting in the bank account, I'll throw in

24   a hundred thousand dirty -- dollar bills of dirty money; and as

25   long as we can go forward -- I'll keep spending out of that

58

1    bank account.  As long as we can go forward and count each

2    individual bill, then we can figure out which ones were dirty

3    and which ones were clean.  That's not what commingling is.

4              THE COURT:  So you are not -- the concession I tried

5    to put in your mouth is not a concession?

6              MR. HUNTER:  I'm not conceding that.  No, Your Honor.

7              THE COURT:  Okay.  So if -- not to use the safe

8    analogy, although I do like the safe and the jewelry, but this

9    is two completely separate bank accounts -- so if there were --

10   there was, you know, the -- we'll use local banks -- Huntington

11   Bank and Fifth Third Bank accounts, and the Fifth Third Bank

12   was what Mr. Barlow had from his retirement, and that's what he

13   bought the property from, whatever, and the Huntington Bank was

14   the DTO and where he bought his -- in that case, would there be

15   from your perspective commingling because he was living --

16   because he was able to live off the Huntington account, he

17   didn't need the Fifth Third account?

18             MR. HUNTER:  No.  Because the way that this would

19   apply to this situation, he would take the money from both of

20   those accounts and put it into another bank account and then

21   live out of that and run his drug organization out of that.

22             That's the commingling of all of the funds, and I think

23   that's what the evidence and testimony establishes here.

24             He was putting funds that came from dark web markets

25   that went through mixers.  Those end up in his private wallet.

59

1    Even if there was some innocent bitcoin in there, at

2    that point he has tainted all of those proceeds.

3         THE COURT:  At that point it loses its traceability

4    because of the overall use of the account?

5         MR. HUNTER:  Yes, Your Honor.

6         THE COURT:  Okay.

7         MR. HUNTER:  I want to make this clear for the record,

8    so I'm actually going to read a little bit here.

9         The United States' position is that all of the property

10   in the proposed preliminary order of forfeiture, it's the same

11   property that was identified in the plea agreement and the

12   Superseding Bill of Information.  It was:  The proceeds was

13   involved in or facilitated the crimes which Mr. Barlow has

14   pleaded guilty to.

15        At the very least, Mr. Barwell [sic], I think, even

16   admitted it on the witness stand today, took funds in

17   cryptocurrency that was the proceeds, that was involved in or

18   facilitated the drug trafficking organization and money

19   laundering conspiracies and commingled those funds and the

20   cryptocurrency that ultimately resulted in the property -- the

21   purchase of the property and the cryptocurrency that he's

22   seeking to kind of set aside.

23        The arguments presented in our reply, coupled with the

24   testimony and the exhibit presented by Special Agent Libow this

25   morning, certainly established by a preponderance of the

60

1    evidence, much less Mr. Barlow has not carried his burden,

2    multiple theories of forfeiture that provide a basis for

3    forfeiture.

4         The United States after this hearing will file an

5    Amended Order for Forfeiture after these proceedings with

6    proposed findings of facts, and we're simply going to request

7    the Court to enter that order.

8         Additionally, we're going to ask that the Court order

9    Mr. Barlow to provide the full name, telephone number, last

10   known address of any third party that he asserts that may have

11   an interest in the cryptocurrency or wallets that have been

12   identified in any forfeiture order.

13        We will notice those parties and give them an

14   opportunity to make claims in an ancillary proceeding.

15             THE COURT:  Okay.

16        So let me deal with that last thing first, which is,

17   yeah, if you will get to the government who the people that you

18   say you are doing these investments for, they will provide the

19   notice, and then they will be able to assert their own rights.

20        My only other question then is:  So did I read too much

21   into your argument about the fact that potentially, you know,

22   if so -- if I buy that the money is distinct, am I right that

23   your argument is, well, even if it was distinct within the

24   wallet, sending that clean money to the Philippines and through

25   the mixers and all of those other things, that that was illegal

61

1    and in violation of Count 2?

2           MR. HUNTER:  I believe it is illegal, Your Honor.  It

3    was not a violation of Count 2.  That was not spelled out in

4    the Statement of Facts supporting Count 2.  We didn't specify

5    that transaction.

6           I brought that transaction to the Court's attention for

7    two reasons:  One is I do think it is illicit and shows that he

8    was laundering funds even out of that wallet.  But, second,

9    he when -- in the response to our preliminary order of

10   forfeiture, he neglected to tell the Court any of the details

11   about how that transaction went down.

12          It was like I used -- "I bought this property with this

13   money."

14          What he didn't tell you was the efforts, again, he took

15   to conceal the nature and origin of those funds.

16          THE COURT:  Okay.  All right.  Thank you.  Any final

17   word?

18          MR. MISHLER:  Briefly, Your Honor.

19          THE COURT:  Go ahead.

20          MR. MISHLER:  I would just like to apologize to the

21   Court.  Any lack in our reply was probably the fault of me for

22   not understanding, not Mr. Barlow's intention not to share that

23   information with the Court.

24          I tried to make that reply as simple as possible just

25   because I don't really understand crypto well enough to get

62

1     into the weeds.

2          I think the most telling thing here is the

3     reasonableness of the request.

4          You've seen the forfeiture request list.  It's like

5     three pages long.  It was over a hundred wallets listed.  He's

6     only asking for three wallets and a piece of property because

7     that's what he believes came from the legitimate pre-DTO funds.

8          I mean, I think it would be a very different story if he

9     was asking for half of this cryptocurrency to be returned, and

10    he's not.

11         THE COURT:  But -- but it's not -- I mean, it's not

12    the percentage of what he's asking to be returned.  It's "has

13    he met the burden of proof of" --

14         MR. MISHLER:  I understand.

15         THE COURT:  -- "whether the source was subject to" --

16    "whether the funds are subject to forfeiture or not?"

17         So, I mean, it's not a percentage evaluation, right?

18         It's a legal evaluation of whether the proceeds were --

19    and I don't have the language in front of me but -- I mean, but

20    whether the proceeds were used in the furtherance of the drug

21    trafficking organization.  Right?

22         I mean, so it's not a -- it's not a percentage of, oh,

23    I'm only asking for 10 percent or 5 percent.  It's "were the

24    funds used or weren't they?"  I mean, that's the legal issue.

25         MR. MISHLER:  I understand, Your Honor.

63

1          THE COURT:  All right.  Thank you.

2          MR. MISHLER:  Thank you.

3          THE COURT:  Well, then that kind of brings that piece

4     to a close.

5          To the extent that we'll now go into the sentencing, I

6     understand that we have at least one person on Gotomeeting, two

7     people on Gotomeeting.

8          Are both of them going to talk?

9          MR. MISHLER:  I only know of one.  I don't know if the

10    other one wants to talk or not.

11         THE COURT:  Okay.  So I think she can hear me.  So

12    we're going to -- I need to talk to counsel first.  This will

13    not take very long, and so probably about ten minutes,

14    you'll -- you'll be on, and we'll -- does she go by

15    Mrs. Barlow?  No, she's remarried.

16         MR. MISHLER:  Johnson.

17         THE COURT:  Johnson.  Mrs. Johnson.

18         So, Mrs. Johnson, so we'll -- I'll go to you first.

19    We'll have some preliminary just housekeeping, and then we'll

20    have any statements of support, and so we'll go to you first,

21    Mrs. Johnson, and if I can see counsel in back.

22         (Proceedings held in the robing room.  Defendant not

23    present.)

24    ██████████      ████████████████████████

25    ████████████████████████████████████████











18    (The following proceeding was held in open court.

19  Defendant present.)

20          DEPUTY CLERK:  Your Honor, the case before you --

21          THE COURT:  We're on the same case.

22          DEPUTY CLERK:  Okay.  It sounds good.

23          THE COURT:  All right.  So we are now on the

24  sentencing portion of the hearing.

25          Mr. Barlow, will you please stand.  So, Mr. Barlow, did

1  you receive a copy of a document called a Presentence

2  Investigation Report?

3          THE DEFENDANT:  Yes, I did, Your Honor.

4          THE COURT:  And did you review the information

5  contained in that report?

6          THE DEFENDANT:  I did, Your Honor.

7          THE COURT:  Did you also get a chance to talk to your

8  lawyer about that report?

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  And, Mr. Mishler, I understand there's no

11  unresolved objections to the presentence report; is that right?

12          MR. MISHLER:  Yes, Your Honor.  That is correct.

13          THE COURT:  The government did file a motion for

14  downward departure, which is granted; and with that, I do adopt

15  the Statements of Fact included in the Presentence

16  Investigation Report as my own, as well as the conclusions

17  reached in that report, and that does result in an Offense

18  Level in this case of 27, with a Criminal History Category

19  of I, and a Sentencing Guideline Range of 70 to 87 months of

20  imprisonment.

21          Both the U.S. Attorney and the defense did submit

22  written memos on the topic of sentencing.  I've read those,

23  along with the letters.

24          I will say one of the letters that the I's and the L's

25  didn't print.  I don't know if you were testing me,

70

1    Mr. Mishler, but -- I'm teasing.  It was fine.  Everything was

2    good.  I did read all of the letters.

3         And so I'll now hear any additional arguments regarding

4    the appropriate sentence to impose, and so hopefully this

5    works.  So I'll tell you what.  Why -- you are welcome to be

6    seated.

7         Let's see if we can get -- hear from Mrs. Johnson first.

8    And this is Mr. Barlow's mother, correct?

9         MR. MISHLER:  Yes, Your Honor.

10        THE COURT:  Okay.  So, Mrs. Johnson, can you hear me?

11        DEPUTY CLERK:  Your Honor, I sent her an "unmute"

12   request.  She is now unmuted.

13        THE COURT:  Mrs. Johnson?

14        FEDERAL MARSHAL:  Would you like the family members to

15   step outside and call her on the phone?

16        DEPUTY CLERK:  No, she's here.  She's on.  She just

17   disappeared again.

18        UNIDENTIFIED WOMAN:  She was not able to hear.

19        THE COURT:  Hmm.  That's not good.

20        DEPUTY CLERK:  Your Honor, I have the sound up as loud

21   as it will go.

22        THE COURT:  Why don't you call her and let her know

23   that we're ready, and we'll try to also work while you are

24   doing that to make sure she can hear us.

25        UNIDENTIFIED WOMAN:  Should she turn her camera on?

71

1          THE COURT:  Yes, please.  This can be all off the

2     record, Allison.

3          (Discussion off the record.)

4          THE COURT:  Let's go back on the record.

5          MR. MISHLER:  Go ahead.  Whenever you're ready.

6          MRS. JOHNSON:  Okay.  I just want to thank you so

7     much, Your Honor, for allowing me to say a few words and

8     allowing me to be on Zoom.  Although I'm not able to hear

9     anything that's going on, I can see you but not hear you.

10          But I'm sure, as you are seeing today, that this is not

11     your normal drug case that you guys see a lot of.

12          THE COURT:  We can hear you and see you on video now,

13     so good.  Shut off your phone.  That will help with feedback.

14          MRS. JOHNSON:  Oh, there, okay.

15          THE COURT:  Thank you.

16          MRS. JOHNSON:  My daughter Michone, I don't think, can

17     hear either.  So you can see and hear me now?

18          THE COURT:  Yes, ma'am.

19          MRS. JOHNSON:  Okay.  Thank you, Your Honor, so much.

20     Oh, okay.

21          Again, thank you so much, Judge Morrison, for letting

22     me -- allowing me to be here and do this.  I wasn't able to fly

23     out, so I'm very grateful for this.  I'm sure that you are

24     seeing today that this is not your everyday normal drug case

25     that you probably do see a lot of.

72

1    I want you to understand that my son, James Verl

2    Barlow -- sorry -- has never ever hurt anybody purposefully.

3    He always wanted to help people, not hurt them.

4        He was very naïve in all of this. When he saw the

5    benefits of mushrooms that he happened upon, they helped him so

6    much. So he did a lot of research before he started down this

7    road, making sure that they were a hundred percent safe, with

8    the intent to help a lot of people.

9        He never ever wanted to hurt anyone, but he has hurt a

10   lot of people, not the customers, but his family and friends

11   that trusted him and helped him with the business, and that is

12   killing him.

13       He knows that their lives and his has been uprooted,

14   never to be the same. They are all carrying the title now of

15   convicted felons.

16       They have never broken the law before. They can't vote.

17   That was a privilege they never took for granted. Then he

18   served his country for many years to protect that right for

19   all.

20       To be into the legal system for the first time ever, my

21   younger brother, Jimmy's uncle, was sent to prison camp in

22   Tucson on November 1st to serve a two-month sentence, but there

23   was some kind of lockdown, so he ended up in solitary

24   confinement for 29 very long, hard, hard days. And in his

25   words, he was treated like a rapist or a murderer.

73

1    They wouldn't listen to him.  And he -- that was his

2    words, that he felt he was treated like a rapist or a murderer.

3    They slammed him against a wall and spit on him, a guard

4    did and was called -- you know sometimes what prison can be

5    like and that -- anyway, he's still serving there, but he is in

6    the camp now.

7    Jimmy and Matt spent seven months in four very miserable

8    jails being handcuffed, shackled, bussed on what they call

9    "Con Air" with other criminals who were vile, and they were --

10   these other men were cussing at the authorities, urinating on

11   the airplane floor because of the conditions they were in.

12   They were malnourished, housed with murderers and drug

13   lords who had hurt a lot of people on purpose.  They were

14   yelled at by the guards.

15   They had to pay hundreds of thousands of dollars total

16   for lawyers, which Jimmy wanted to pay for all of the lawyers

17   that his friends had to pay for, but -- until the government

18   confiscated all of his money, both -- both earned through the

19   business in question, which is understandable, and that he

20   legitimately earned through wise investments in cryptocurrency

21   before he started the other business.

22   These two boys were suddenly ripped out of society when

23   they were arrested, and they were not able to take care of the

24   bills that kept coming in but no money was being put in because

25   they were in jail to cover all the -- all the auto pays,

74

1     including medical care and all of their living expenses.

2          So when they were finally released, their good credit

3     was ruined.

4          Jimmy's brother Matt lost his house and subsequently

5     access to Attie, his stepson, that he loved very much.

6          Sorry.

7          Jimmy has always loved to travel and see the world,

8     which has been taken away too, hopefully not forever or for

9     very much longer.

10         It's really hard to see him treated the same as and

11    incarcerated with men who sold heroin, ecstasy, and other

12    things that kill people and hurt people, and with men who did

13    purposely hurt people.

14         It just -- I just want this all to be over, and let them

15    go on with their lives.  This has been the worst and hardest

16    year and a half of all of our lives since they were arrested.

17         I know the law was broken, and justice must be served.

18    But I feel they have already paid so much for their mistake,

19    and Jimmy and Matt both admit there was a big mistake.

20         He -- both of them, they are so sorry for what they did,

21    especially Jimmy because of what he has cost others, and I can

22    guarantee you that he will never ever do it again or anything

23    else illegal.

24         I don't think either one of them will ever jaywalk

25    again.

75

1    Jimmy has been in a very deep depression over all of

2    this.  He would have gladly served all of the sentences of the

3    others that he got involved.  He said so from the very

4    beginning, but they told him it doesn't work that way.

5    Your Honor, I'm very worried about him.  Being a retired

6    Army sergeant, he suffered from PTSD that I'm not even sure his

7    closest friends knew about.  I certainly didn't until I read

8    his letter to you last week, and it broke my heart.

9    I didn't know.  When he was arrested, he told his lawyer

10   to make sure that I got a copy of a book by Michael Pollan

11   called *How to Change Your Mind* which would help me to

12   understand why he did what he did.

13   I did get that book, and now I understand but do not

14   condone why he did what he did.

15   He knew that mushrooms were very safe and very

16   beneficial in treating PTSD, depression, alcoholism, anxiety,

17   curing addictions; and he even found that lives were saved,

18   suicide avoided, because the psilocybin helped clarify the mind

19   in a safe way.  He knew that no one ever had overdosed on

20   mushrooms ever.

21   I know that both Jimmy and his lawyer are asking for a

22   shorter sentence rather than a longer one, but I as his

23   mother -- who knows his heart so well -- am asking for time

24   served and all the loss and mental anxiety that he has suffered

25   for what he has caused others to be sufficient, and I do

76

1    understand though there will be some kind of probation

2    afterwards, so it still won't be over.

3          In closing, I don't understand what sending him back to

4    prison would accomplish.  He is not a threat to society.  He

5    doesn't need rehabilitation.  And I hope you can see that,

6    after reading his letter to you, he has already paid so much.

7          The types of men that he will -- he would be forced to

8    associate with worries me a lot.

9          In final closing, I ask you:  Please don't send my son

10   back to prison, where he will most likely be mistreated.  And

11   it's so hard for us to stay in communication while he's in

12   prison.

13         The only time he has been in a place as dangerous as

14   prison in his life is when he was deployed to serve and defend

15   his country.

16         I have been praying for justice and for mercy from the

17   very beginning of the situation.  I feel that justice has

18   already been served, the price more than paid.  Now I pray for

19   mercy.

20         Thank you so much, Your Honor, for your time.

21          THE COURT:  Yeah.  Thank you, Mrs. Johnson.  I

22   appreciate it.  I read your letter.  You weren't able to hear

23   me earlier.  I did read your letter, and I appreciate hearing

24   from you directly as well.  So thank you.

25          MRS. JOHNSON:  Thank you.

77

1    THE COURT:  Mr. Barlow, you are also not required to

2  speak as part of this sentencing hearing.  But if there's

3  anything you would like to tell me before I impose sentence,

4  now is your chance to do that.

5    Also, I did read your letter.  As I told your attorney,

6  please don't read your letter.  If there's anything else you

7  want to let me know, now is your chance.

8    THE DEFENDANT:  Yes, Your Honor.  I'm comfortable with

9  the things I wrote in that letter.  I won't be rehashing

10  anything there.

11    The only thing I have to add is that, you know, prison

12  is a bummer for everyone and -- but for me, the two

13  particularly lowest points that I recall was, first, when I was

14  about a week in and just the dawning realization of how many

15  people were in cells like me, and these are the people I love

16  most in the world -- especially my little brother.  I love that

17  guy.

18    And so -- that just felt rough, knowing that I put him

19  there and I was -- I felt powerless to help him.

20    And the second one was one that I wasn't expecting.  It

21  was about five months in when I first got the copy of my

22  indictment, and I saw at the top, the United States of America

23  versus James V. Barlow.  And that hurt.

24    The entire time that I -- I was selling mushrooms, I

25  never once thought of myself as an enemy of the United States.

78

1       And even as I got started down this road, just with all

2   the branches of government, how I had run afoul of, starting

3   with -- even if I want to innocently say I have a polite

4   disagreement with the legislative branch about where mushrooms

5   should be scheduled, I still broke other laws that -- that

6   Congress has passed down, and then representatives from the

7   executive branch use those laws and enforce them in coming

8   after me, and I now stand before the judicial branch to find

9   out what the next few years of my life are going to be

10  entailing.

11      And I just want to say, Your Honor, I'm sorry.  I am

12  never going to be in this position again.

13          THE COURT:  Thank you, Mr. Barlow.  I appreciate it.

14      Mr. Mishler, do you want to add anything from your

15  sentencing memo?

16          MR. MISHLER:  No, Your Honor.  I believe the

17  sentencing memo has all the arguments I would make.

18          THE COURT:  Good.  Thank you.  You may be seated.

19      Mr. Hunter, would you like to expand on your memo?

20          MR. HUNTER:  Yeah.  Briefly, Your Honor.

21      Your Honor, I just first want to take on the notion

22  that, you know, the selling of the psilocybin analogue is

23  simply an effort to help people.  It is a Schedule I controlled

24  substance.

25      Even in Paragraph 27 of the Presentence Investigation

1    Report, the investigation documented some 50,000 drug

2    transactions by the dark web market sites that Mr. Barlow set

3    up.

4         Mr. Barlow has no idea who was on the receiving end of

5    those other 50,000 transactions.

6              THE COURT:  I mean, that came up in one of the other

7    sentencings.  I don't now remember which defendant in this case

8    it was.  But, I mean, I'm aware of the literature.  I'm aware

9    of the Michael Pollan book, of course.

10        But the reality is that even in Oregon, even to the

11   extent it has been legalized, it is in controlled settings

12   under the care of a doctor in a therapeutic setting, and you

13   know who it is getting -- clearly, when you are selling on the

14   dark web, it could be a 13-year-old child who is buying it.  It

15   could be an 80-year-old.

16        I mean, between the lack of knowledge of who is buying

17   it -- but also it's not in a therapeutic setting.  There's no

18   controls.  There's no ability to -- the restraint that Oregon,

19   as an example, has put on a use of it, although they have

20   legalized it, are notably absent.

21        So I don't -- I don't want to stop you, but I agree with

22   you.

23             MR. HUNTER:  I couldn't have said it better.  I don't

24   think I need to expound on it.

25        The other thing that I feel that I need to point out is,

80

1    when I looked at page 4 of Mr. Barlow's letter to the Court, he

2    talked about how he taught himself about mycology and fungal

3    farming.  He got the necessary equipment.

4        I think the picture that's been painted, and I think

5    that Mr. Barlow painted through his drug trafficking

6    organization, was that he was on a mushroom farm growing these

7    things naturally, holistically, and then packaging them for

8    distribution.

9        That is not what Mr. Barlow was doing.  These are not

10   psilocybin mushrooms.  This is a psilocybin mushroom analogue.

11       These were chemicals that he was getting from China that

12   he was mixing up and selling to his customers as though he were

13   a mushroom farmer.

14       And, again, I just -- again, I think it speaks to

15   Mr. Barlow's trying to create a parallel reality from what is

16   depicted in this presentence investigation and in the

17   Presentence Investigation Report.

18       I'll simply say this, Your Honor:  For seven years,

19   James Barlow ran a drug trafficking and money laundering

20   organization.  He employed more than 12 people over the course

21   of that conspiracy.  He made himself a multimillionaire by the

22   amount of controlled substances that he was selling.

23       Psilocybin mushrooms -- they are not fentanyl, they are

24   not methamphetamine, they are not the worst drug that comes

25   before this Court, but the scale and scope of what Mr. Barlow

81

1    did as a leader and organizer deserves a sentence within the

2    advisory guideline range.

3         In this sentence -- in this case, the advisory guideline

4    range is 70 to 87 months.  We recommended a sentence at the

5    lowest end of that guideline range.

6              THE COURT:  Thank you, Mr. Hunter.

7         Anything additional from Probation?

8              THE PROBATION OFFICER:  No, not at this time.

9              THE COURT:  I saw you sneak in over there.  All right.

10   Mr. Barlow, will you please stand.

11        So Mr. Barlow is before me for sentencing after pleading

12   guilty to conspiracy to possess with intent to distribute a

13   controlled substance and conspiracy to commit money laundering.

14        After the Supreme Court decision in *United States v.*

15   *Booker,* I am required to undertake a three-part analysis before

16   I impose the final sentence.

17        The first task is to compute the sentencing guidelines,

18   which has been done, and the guideline range is 70 to 87 months

19   of imprisonment.

20        I am next to consider the guidelines themselves to see

21   if there are any appropriate departure bases either up or down,

22   and that does include a downward departure.

23        Then the last part of the sentencing process requires me

24   to look at a series of factors contained in federal law to make

25   sure that any sentence imposed is sufficiently severe to

82

1     accomplish all of the goals of sentencing but no more severe

2     than necessary to accomplish those goals.

3          The first step requires me to look at the nature and

4     circumstances of the offense, together with the history and

5     characteristics of the defendant.

6          Starting with the offense conduct, Mr. Barlow was the

7     head of a drug trafficking organization that distributed liquid

8     and powder psychedelic mushroom analogue.  He recruited his

9     brother and his girlfriend, among others, to work for him.

10         He concealed the proceeds from his drug sales by

11    accepting payments and paying his employees in cryptocurrency

12    and using mixing services to cover up the true nature, origin,

13    and sources of the funds.

14         The government believes that the proceeds from the drug

15    trafficking were in the neighborhood of 12 to 15 million

16    dollars in currency and property.

17         Mr. Barlow has accepted responsibility for the offense.

18         Mr. Barlow is a 25-year Army veteran.  He was deployed

19    overseas several times and has received multiple commendations

20    and awards for his service.  He retired honorably in 2019.

21         Mr. Barlow grew up as part of a large family that was

22    active in the Church of Latter-Day Saints.  The family was

23    committed to the religion; and though his parents divorced, it

24    seems they all continue to be close.

25         And I've read the letters from the family members.  And,

83

1    of course, we heard from his mother today all the way from her

2    mission in Idaho.  So that was very nice.  She worries about

3    you.

4         Mr. Barlow has never married and has no children, and

5    the only time that he has been involved with the criminal

6    justice system is this case.

7         There are reports that Mr. Barlow suffered from PTSD and

8    depression.  I am not aware of a formal diagnosis, but there

9    has been some mental health evaluation earlier this year with a

10   referral for outpatient services.

11        Although -- have you enrolled in outpatient services?

12           THE DEFENDANT:  Your Honor, I'm not sure what -- as

13   far as like with the VA?

14           THE COURT:  With anyone.  Have you been going to

15   mental health counseling?

16           THE DEFENDANT:  Yes, I have.  I have been, Your Honor,

17   through the VA.

18           THE COURT:  Through the VA.  Okay.

19        Mr. Barlow has experimented with various substances,

20   including using psychedelic mushrooms himself starting in 2011.

21        He has completed a drug and alcohol assessment but, for

22   that, was not referred for any treatment services.

23        Mr. Barlow is an entrepreneur.

24        In addition to this business, he has several businesses

25   with Dwight Calwhite in Las Vegas.

84

1    I am disappointed at one of the things that did catch my

2  attention.  It is that Mr. Barlow did not provide the probation

3  officer with authorization to pull a credit report and did not

4  complete a financial statement for probation as part of the PSR

5  process.

6    I am also required as part of sentencing to look at a

7  sentence that promotes deterrence to people who might be

8  inclined to commit this kind of offense, look to the

9  seriousness of the crime involved, protects the public, and

10  also promotes respect for the law.

11    And, finally, I'm required to avoid unwarranted

12  sentencing disparities among defendants with similar records

13  and guilty of similar conduct.

14    So when I take all of this into consideration, I do

15  believe a downward variance is appropriate.

16    Pursuant to the Sentencing Reform Act of 1984 and

17  18 U.S.C. Section 3553(a), it is the judgment of the Court that

18  the defendant, James Barlow, is hereby committed to the custody

19  of the United States Bureau of Prisons to be imprisoned for a

20  term of 36 months.

21    It's three years.

22    Upon release from imprisonment, Mr. Barlow shall serve a

23  term of supervised release of three years on Counts 1 and 2, to

24  be served concurrently.

25    And I should have said for the term of incarceration,

85

1    that is also on Counts 1 and 2, to be served concurrently.

2         Within 72 hours of release from imprisonment, Mr. Barlow

3    must report to the probation office in the district to which he

4    is released.

5         While he is confined in the Bureau of Prisons, I do

6    recommend that he undergo a mental health evaluation and any

7    treatment recommended at that point.

8         While on supervised release, Mr. Barlow must not commit

9    another federal, state, or local crime.  He is prohibited from

10    possessing a firearm, ammunition, destructive device, or

11    dangerous weapon.

12         He must not unlawfully possess a controlled substance

13    and must refrain from any unlawful use of a controlled

14    substance.

15         You will have to submit to one drug test within 15 days

16    of release from imprisonment and at least two periodic tests

17    thereafter as determined by the Court.

18         You will have to cooperate in the collection of your DNA

19    as directed by the probation officer and must comply with the

20    standard conditions of supervised release adopted by this

21    Court, as well as the following special conditions:

22         First, you will have to participate in a program of

23    mental health assessment and counseling as directed by the

24    probation office until you are released from that program.

25         There will be a copayment of no more than $25 per month

86

1    for those services, which will be determined by your ability to

2    pay.

3         Second, you will have to provide the probation officer

4    with all personal financial information and records upon

5    request by the probation officer and until the fine is paid.

6         And also, number three, you cannot incur any new credit

7    charges or open any lines of credit without approval of the

8    probation officer until your fines are paid.

9         With that, Mr. Barlow shall pay a $30,000 fine and a

10    $200 special assessment.

11         Both are due immediately, with any unpaid balance to be

12    paid in the amount of not less than 10 percent of his net

13    income per month.

14         While incarcerated, if he is working in a non-UNICOR job

15    or Grade 5 UNICOR job, you will have to pay $25 per month

16    toward your obligation.  If you work in a Grade 1 through 4

17    UNICOR job, you will have to pay 50 percent of your monthly pay

18    toward the restitution obligation.  Any change in the schedule

19    shall be made only by order of the Court.

20         What I'll do on the forfeiture, and I should have said

21    this earlier, I will take the argument under advisement and get

22    something out promptly just so you know what my ruling will be

23    on the forfeiture, but there will be the final forfeiture order

24    coming.

25         With that, are there any legal impediments or other

87

1   objections to the sentence I've just announced, Mr. Mishler?

2          MR. MISHLER:  No, Your Honor.  I would just ask for a

3   delayed surrender date.  Ninety days should probably be enough

4   for him to get his affairs in order.

5          THE COURT:  Okay.  Mr. Hunter, anything else?

6          MR. HUNTER:  There are no objections by the

7   United States.  I do note that there is a Pretrial Service

8   Report violation report.

9          THE COURT:  Okay.  Let me talk about the right to

10  appeal, and then we can talk about the self-surrender.

11         So, first, let me review with you your right to appeal

12  the sentence I have just given you, Mr. Barlow.

13         Under some circumstances, a defendant has the right to

14  appeal his sentence.  However, he may waive that right as part

15  of a plea agreement.  In this case, you did enter into a plea

16  agreement that waives some or all of your rights to appeal the

17  sentence itself.

18         Such waivers are generally enforceable, but if you

19  believe the waiver itself is not valid, you can present that

20  theory to the appellate court.

21         If you want to appeal the sentence, you have to file a

22  written Notice of Appeal within 14 days from the entry of

23  judgment.

24         The judgment will go on either today or tomorrow.

25         If you are unable to afford the filing fee or a lawyer

88

1   to represent you, you can apply to this Court, and the filing

2   fee may be waived and a lawyer may be appointed to represent

3   you.

4           Do you understand your right to appeal?

5           THE DEFENDANT:  Yes, Your Honor.

6           THE COURT:  Okay.  Do you want to talk with your

7   attorneys and let me know if you want to appeal the sentence I

8   have just given you?

9           (Pause in proceedings.)

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  Do you want to appeal or do you want to

12  talk?

13          MR. MISHLER:  Briefly, Your Honor.  Sorry.

14          THE COURT:  Okay.

15          (Pause in proceedings.)

16          MR. HUNTER:  Thank you, Your Honor.

17          THE COURT:  Do you want to appeal the sentence I have

18  just given you?

19          THE DEFENDANT:  No, Your Honor.

20          THE COURT:  Okay.  Like I said, you've got 14 days

21  from the entry of judgment.

22          So if you change your mind, if you go back and think

23  about it, you have to file a written Notice of Appeal.

24          Mr. Hunter, you had something further?

25          MR. HUNTER:  Yes, Your Honor.

89

1    I just want to make sure that we're in technical

2    compliance with the Rule 32.2 as to the forfeiture.

3    So the government asks that the Court include any

4    forfeiture as part of any sentence, and that includes any

5    property identified in the forfeiture order.

6    Even if it is issued post-sentence, it just needs to be

7    clear on the record that that is indeed part of the Court's

8    sentence in this case, the forfeiture in this case.

9    THE COURT:  Okay.  So that I make sure that I get it

10   right, I did put on the general order of forfeiture that the

11   parties agreed to.  That went on yesterday.

12   And then typically my final judgment just incorporates

13   and says there will be a forfeiture order coming pursuant to

14   the preliminary order of forfeiture.

15   Is that sufficient?  Are you suggesting I need to do

16   something different?

17   MR. HUNTER:  Only the -- what the case law says is

18   that a court must include a forfeiture in an oral announcement

19   or otherwise ensure the defendant is aware of the forfeiture at

20   sentencing, and so I just wanted to be clear that part of the

21   sentencing in this case is going to be the forfeiture order,

22   whether you grant it or not.

23   THE COURT:  Okay.  Yes.  And so in case I was not

24   clear, Mr. Barlow, the final -- the final judgment that will go

25   on from the sentencing will reference the final forfeiture

1  order to be coming, but there is a preliminary order of

2  forfeiture that has already been ordered, and there will be a

3  final order of forfeiture that will be put on after the

4  judgment.  But the judgment will reference that there is a

5  forfeiture order coming.

6          And I know you are thinking:  Why am I telling you all

7  of this?  And it's just so -- the rules are pretty strict

8  because -- because of notice, and we want to make sure that you

9  have notice of everything that happens with the forfeiture.

10         So that's what we're going to be doing.  Thank you.

11          MR. HUNTER:  That's all, Your Honor.  I think that

12 covers it.

13          THE COURT:  So there is a request for self-surrender.

14         I will say that I did get a report from Pretrial

15 Services.  There has been a prior violation for the -- for

16 pretrial because Mr. Barlow had contact with a co-defendant,

17 failed to report for testing, and then since he dealt with

18 the magistrate -- appeared before the magistrate judge in

19 August, even since that time, Mr. Barlow has missed multiple

20 telephonic check-ins, he's missed several urinalyses.  And when

21 he did show up on November 10th, he stalled and was unable to

22 provide a specimen so that a urinalysis can be performed; in

23 addition to the fact that Mr. Barlow has had over a year to

24 obtain employment and has not done so.

25         So, Mr. Hunter, does the government have a position on

91

1  self-surrender?

2          MR. HUNTER:  No, Your Honor.  I agree to defer to

3  Pretrial Services.

4          THE COURT:  Okay.  Mr. Mishler.

5          MR. MISHLER:  I understand the Court's concerns,

6  Your Honor, but I think the prime issue is whether he's going

7  to show up for self-surrender, and -- I mean, he's never missed

8  a hearing.

9          He may have some issues with reporting in.  I mean, I

10 think that's clear.  But, I mean, ultimately, I don't think

11 there's any question that he's going to show up to

12 self-surrender.

13         THE COURT:  Well, no, but that's not the only issue,

14 right?  I mean, if that was the only issue, then the conditions

15 on pretrial release would be "show up when we tell you to," but

16 the conditions are there for a reason.

17         MR. MISHLER:  I understand.

18         THE COURT:  And in all candor, when I saw the

19 violation report last summer, frankly, had I seen it before the

20 magistrate judge got it, I probably would have revoked him

21 then.

22         I wasn't real happy to see the contact with the other

23 co-defendants.

24         We had a long talk when we took the plea, and we talked

25 about his conditions, and I think we tried to be very generous

1    in terms of obvious contact with his brother.

2         There has been a lot of travel that most defendants

3    don't get to do, and so I -- but I didn't see Mr. Barlow in

4    August.  The magistrate judge did.

5         And instead of saying, oh, okay, I've got sentencing

6    coming up, there were -- one, two, three -- there were at least

7    four missed check-ins, two missed urinalyses.

8         And then, like I said, the one time he did show up, he

9    was unable to provide a specimen.

10        So that's my thoughts.

11        Anything further, Mr. Mishler?

12        MR. MISHLER:  I don't have anything relevant to your

13   concerns, Your Honor.  No.

14        THE COURT:  Okay.  Then we are going to take

15   Mr. Barlow into custody, and he can start his sentence.

16     (Pause in proceedings.)

17        THE COURT:  Let's take a 10-minute recess, and then I

18   would like to see counsel for Matt Barlow, and again if

19   Mr. Barlow wants to come back, he's welcome to.

20      (The proceedings were adjourned at 11:17 a.m.)

21

22

23

24

25

*Allison A. Kimmel, FAPR, RDR, CRR, CRC*
*Federal Official Court Reporter*
*85 Marconi Boulevard*
*Columbus, Ohio 43215*
*614.719.3225*

93

1                              - - -

2                         WITNESS INDEX

3                              - - -

4    WITNESSES              DIRECT CROSS REDIRECT RECROSS

5    DEFENDANT'S:

6    James Barlow            5     21      28

7                              - - -

8                         WITNESS INDEX

9                              - - -

10   WITNESSES              DIRECT CROSS REDIRECT RECROSS

11   PLAINTIFF's:

12   Greg Libow             29     45      52

13

14

15

16

17

18

19

20

21

22

23

24

25

*Allison A. Kimmel, FAPR, RDR, CRR, CRC*
*Federal Official Court Reporter*
*85 Marconi Boulevard*
*Columbus, Ohio 43215*
*614.719.3225*

94

1          C E R T I F I C A T E

2

3          I, Allison A. Kimmel, do hereby certify that the

4   foregoing is a true and correct transcript of the proceedings

5   before the Honorable Sarah D. Morrison, Judge, in the United

6   States District Court, Southern District of Ohio, Eastern

7   Division, on the date indicated, reported by me in shorthand

8   and transcribed by me or under my supervision.

9

10

                          s/Allison A. Kimmel
11                        Allison A. Kimmel, FAPR, RDR, CRR, CRC
                          Official Federal Court Reporter
12                        April 17, 2023

13

14

15

16

17

18

19

20

21

22

23

24

25